IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO.

CRUBIN, LLC, a Florida limited
liability company,

      Plaintiff,

v.

JESUS "ALEX" ESCORIAZA, an
individual,

      Defendant.

_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff CRubin LLC ("***Dynasty Sports***") files this Complaint for Damages and Injunctive Relief against Defendant Jesus "Alex" Escoriaza ("***Escoriaza***") and alleges as follows:

## JURISDICTION AND VENUE

1.     This is an action for misappropriation of trade secrets in violation of Federal and Florida law, for injunctive relief for violating a non-disclosure agreement, and for damages for violations of 18 U.S.C. § 1030 (the "***Computer Fraud and Abuse Act***").

2.     This Court has subject-matter jurisdiction over this action pursuant to (a) 28 U.S.C. § 1331, because this action brings claims for misappropriating trade secrets pursuant to 18 U.S.C. §§ 1836 & 1839 and for violations of the Computer Fraud and Abuse Act; and (b) 28 U.S.C. § 1367(a), because Dynasty Sports' state-law claims are so related to its claim for misappropriating trade secrets pursuant to 18 U.S.C. §§ 1836 & 1839 and for violating the Computer Fraud and Abuse Act that they form part of the same case or controversy.

1

3.      Dynasty Sports' principal place of business is in Florida, within this District, where Dynasty Sports directs, controls, and coordinates its activities.

4.      This Court has personal jurisdiction over Escoriaza because Escoriaza is a citizen of Florida, who resides in Miami-Dade County, Florida.

5.      Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b), as the events giving rise to Dynasty Sports' claims occurred in this District and Escoriaza resides in this District.

6.      All conditions precedent to the bringing of this action have been performed or waived.

## FACTUAL ALLEGATIONS

**A.  Dynasty Sports' Confidential Information and Trade Secrets.**

7.      Dynasty Sports is an industry-leading provider of ticket inventory management, ticket pricing optimization, and ticket data and analytics, among other services, to professional sports teams, venues, ticketing providers, and other entities involved in professional sports. Dynasty Sports' goal is to work with its clients to maximize their revenue from ticket sales.

8.      Dynasty Sports' trade secrets include the volumes of data that Dynasty Sports, through its own efforts, has compiled regarding the ticketing market, as well as how that data is used to conduct its business, along with the proprietary software and systems used in its business (the "***Trade Secrets***"). Dynasty Sports' business depends on the Trade Secrets. The volumes of data that Dynasty Sports has amassed gives Dynasty Sports unique information about the functioning of the secondary ticket market. The Trade Secrets are a primary asset of Dynasty Sports, without which its business could not function. If the Trade Secrets were used or shared

with Dynasty Sports' competitors or clients, it could ruin Dynasty Sports' business. Dynasty Sports derives substantial monetary benefit from the Trade Secrets.

9.      Dynasty Sports takes a number of measures to protect the Trade Secrets, including, without limitation, requiring employees to execute employment agreements containing use and disclosure restrictions, and requiring use of individual usernames and passwords, including but not limited to all cases involving email or file sharing. Where it is necessary to use a shared account, such as machine accounts, Dynasty Sports also requires use of a password archive that is itself secured to individual, permitted access, and exceptions are limited to operational and information technology systems where it is impractical to have an individual user credential running software processes on a server. Additionally, Dynasty Sports' networks are protected by firewalls with virtual private network access for authorized users to gain access to internal resources over the internet, and Dynasty Sports' databases are secured by accounts that require authentication and authorization.

10.     Dynasty Sports continues to take reasonable measures to protect the Trade Secrets once employees leave. Former employees' accounts are disabled and/or their passwords are reset, as appropriate. Departing employees are also asked to sign acknowledgment forms, wherein they re-acknowledge their responsibilities with regard to use and disclosure restriction; even if a departing employee refuses to sign an acknowledgement form, Dynasty Sports still reviews these procedures with them to provide a reminder and notice of their responsibilities. Escoriaza signed such a form on his last day of employment.

11.     Escoriaza worked at Dynasty Sports from October 8, 2012 to January 4, 2019. During the majority of Escoriaza's employment, he served as a Vice President, a senior position.

3

12.     When Escoriaza was originally hired, Dynasty Sports had 5 employees. Now, Dynasty Sports has approximately 80 employees and dozens of independent contractors.

13.     Escoriaza has substantial knowledge about information technology. As part of his work at Dynasty Sports, Escoriaza was largely responsible for building and maintaining Dynasty Sports' information technology infrastructure. Thus, Escoriaza was and is extremely knowledgeable about Dynasty Sports' technology infrastructure and had access to Dynasty Sports' confidential and proprietary information, including the Trade Secrets. In addition, Escoriaza has extensive, unique knowledge about Dynasty Sports' business from an operations and accounting standpoint.

14.     During Escoriaza's employment with Dynasty Sports, he and Dynasty Sports entered into a series of employment agreements, including but not limited to:

    i.     On or about October 19, 2016, an Employee Agreement (the "***First Employee Agreement***");

    ii.    On or about November 16, 2012, an Employee Non-Compete Agreement (the "***Non-Compete Agreement***");

    iii.   On or about January 1, 2017, an updated Employee Agreement (the "***Second Employee Agreement***"); and

    iv.    On or about May 14, 2018, an Employee Non-Disclosure and Invention Assignment Agreement, which amended only to the extent therein the Second Employment Agreement (the "***Non-Disclosure Agreement***" and together with the Second Employee Agreement, the "***Employment Agreement***").

A copy of the Employment Agreement is attached as **Composite Exhibit A**. On his final day, Escoriaza signed the Acknowledgment attached as **Exhibit B**.

4

15.     Among other things, the Employment Agreement restricted the disclosure and use of Dynasty Sports' confidential and proprietary information and the Trade Secrets.

16.     In particular, the Employment Agreement:

i.     Broadly defines "Confidential Information" to include, among other things, Dynasty Sports' trade secrets, ideas, business plans, pricing information, computer programs, procedures, processes, strategies, systems, designs, marketing and sales information, and any other technical, operating, financial and other business information relating to Dynasty Sports, its business, potential business, operations or finances (the "***Confidential Information***");

ii.    Requires that Escoriaza use the Confidential Information only in the performance of his duties for Dynasty Sports;

iii.   Precludes Escoriaza from using and disclosing the Confidential information, directly or indirectly, both during and after his employment with Dynasty Sports;

iv.    Requires Escoriaza to take reasonably necessary actions to protect against the disclosure of the Confidential Information; and

v.     Requires Escoriaza to immediately return or destroy all materials containing, summarizing, abstracting or in any way relating to the Confidential Information upon the termination of his employment with Dynasty Sports.

17.     On December 21, 2018, Escoriaza informed Dynasty Sports that he would be leaving the company, and Escoriaza's last day of employment with Dynasty Sports was January 4, 2019.

18.     On Escoriaza's final day at Dynasty Sports, he signed an Acknowledgement, in which he acknowledged the Employment Agreement's enforceability and represented that he "complied and will continue to comply" with the Employment Agreement. *See* Ex. B.

19.     Escoriaza did not return any Confidential Information to Dynasty Sports on or after January 4, 2019.

20.     Escoriaza did not advise Dynasty Sports orally or in writing that he destroyed any Confidential Information on or after January 4, 2019.

21.     After the end of his employment with Dynasty Sports, Escoriaza first began working for a media company. Approximately two months later, he began working for a Miami-based professional sports franchise that is a key customer of Dynasty Sports, where he is still working.[1]

## B. Dynasty Sports Conducts an Internal Investigation and Discovers Escoriaza's Wrongful Conduct.

### i.     The PowerBi E-Mail Account.

22.     In late March 2019, as part of routine auditing, Dynasty Sports noticed that a Dynasty Sports account, used for analytics and data warehousing and also configured to be used for email, powerbi@dynastyse.com (the "***PowerBi Account***"), was configured to give that account "read and manage" access to the email accounts of Cole Rubin, Dynasty Sports' CEO and Director; Jon Katz, COO and Director; Carlyle Kirkpatrick, former CFO; and Michael Freiburghouse, comptroller. In other words, whoever logged in to the PowerBi account could

---

[1]     Dynasty Sports is not naming the professional sports franchise, as it has no basis to believe that it is in any way complicit in Escoriaza's wrongful conduct as described in this Complaint.

read all of these individuals' emails and control their email accounts, such as by reading and moving emails.  Such access would not be known to the users.

23.     This "read and manage" access activity was highly irregular and caused great concern, and Dynasty Sports hired an outside IT security company to conduct further investigation alongside Dynasty Sports' employees.

24.     Through this investigation, Dynasty Sports learned that the PowerBi Account was connected to Escoriaza's personal Gmail address, j.alex.esco@gmail.com, in that this email was used as the recovery email for the PowerBi Account.

25.     This investigation included a review of all logins to the PowerBi Account, including examining the Internet Protocol (IP) addressees used to login to that account.

26.     An IP address is a unique string of numbers that identifies each computer using the Internet Protocol to communicate over a network.

27.     The IP address 172.11.247.111 was used to login to the PowerBi Account successfully, including after the end of the Escoriaza's employment with Dynasty Sports. This IP address was also used to login to Escoriaza's Dynasty Sports email account. Further review showed that this IP address was only used to login to Escoriaza's Dynasty Sports email account and the PowerBi Account; it was not used to login to any other Dynasty Sports email accounts.

28.     As discussed above, once in the PowerBi Account, a user could use that account to monitor the emails of certain Dynasty Sports senior executives.

29.     The last login to the PowerBi Account was on April 11, 2019, at which time it was used to perform a "ViewReport" operation, thereby viewing a report titled "Daily Dashboard tooltip."

### ii.   The Manzaneres E-Mail Account.

30.     Dynasty Sports' investigation also revealed irregularities concerning the email account of another former Dynasty Sports employee, Ana Manzaneres.

31.     Manzaneres' employment with Dynasty Sports ended on April 13, 2018, and her system account (including email access) was deactivated in 2018.

32.     For at least some period of time during and following her employment with Dynasty Sports, Manzaneres and Escoriaza had a romantic relationship. Upon information and belief, they are still dating.

33.     Dynasty Sports' investigation revealed that Manzaneres' system account was re-activated in 2019. Dynasty Sports never authorized the re-activation of this account.

34.     On January 10 and 11, 2019, there were 51 successful logins to the Manzaneres' Dynasty Sports email account.

### iii.   The Escoriaza E-Mail Account.

35.     Dynasty Sports' investigation revealed numerous irregularities surrounding Escoriaza's own Dynasty Sports email account.

36.     Escoriaza's email account had "Full Access" to the Dynasty Sports email accounts of Manzaneres, as well as former employee Tim Goldenstein. In turn, Goldenstein's email account had "Full Access" access to the email account of Daniel Dadi, another Dynasty Sports employee.

37.     Goldenstein is a former Dynasty Sports employee, who worked as a database engineer. Goldenstein passed away suddenly in October 2017.

8

38.     There was no business purpose for Escoriaza to have "Full Access" to Manzanares' email account, and Dynasty Sports never authorized Escoriaza's access to this account.

39.     Dadi is a Dynasty Sports employee who works as a pricing manager and is a shared resource with Dynasty Sports' data team. In that role, he would have constant access to very valuable sales data.

40.     There was no business purpose for Escoriaza or Goldenstein to have access to Dadi's email account, and Dynasty Sports never authorized Escoriaza or Goldenstein's access to this account.

41.     After Escoriaza's employment with Dynasty Sports terminated on January 4, 2019, there were two successful logins to Escoriaza's Dynasty Sports email account, once on January 5, 2019, and once on January 6, 2019.

42.     On April 11, 2019, the IP address 172.11.247.111—the same IP address that was used to login to the PowerBi Account on the same day—was used for eight failed attempts to login to Escoriaza's Dynasty Sports email account. These login attempts failed because Escoriaza's Dynasty Sports email address had been disabled by that time.

### iv.     Escoriaza Accesses Trade Secrets and Confidential Information Immediately Prior to His Termination, and Continues to Access Trade Secrets Confidential Information Following His Termination.

43.     Dynasty Sports' investigation also revealed highly problematic activity concerning the Trade Secrets and Confidential Information and other Dynasty Sports files accessed by Escoriaza immediately prior to the end of his employment with Dynasty Sports.

44.     On December 10, 2018 and again on December 18, 2018, Escoriaza e-mailed an excel export of a client's sales data to j.alex.esco@gmail.com, his personal Gmail account. This

sales data is extremely valuable, highly confidential information. Dynasty Sports considers this data to be part of the Trade Secrets.

45.     On December 19, 2018, Escoriaza e-mailed the full credit card number and four-digit CVV code of Dynasty Sports' master American Express card number, as well as the username and password to a client's college football payable ticket account, to j.alex.esco@gmail.com. This information constitutes Confidential Information.

46.     On December 26, 2018, Escoriaza e-mailed a purchase order template that Dynasty Sports uses to load inventory into its system to j.alex.esco@gmail.com. The purchase order template was for the professional sports franchise that Escoriaza currently works for. Dynasty Sports considers this template to be part of the Trade Secrets.

47.     Dynasty Sports uses Microsoft Office 365, which utilizes a "file-based operation" log that shows when a user previewed, downloaded or accessed a file. Between December 27, 2018 and January 4, 2019, Escoriaza's last day of employment with Dynasty Sports, Escoriaza previewed, downloaded or accessed 411 files.

48.     Many of these files contain Dynasty Sports' Trade Secrets and Confidential Information. For example, Escoriaza downloaded a document containing information about Dynasty Sports' pricing tool, which it uses to price the tickets that Dynasty Sports sells and determine in which marketplaces the tickets will be sold. This tool is absolutely critical to Dynasty Sports' business. This document contained proprietary, nonpublic information about how this tool is set up, including how it functions as both a reporting tool and a pricing dashboard. This information would be very valuable to someone competing with Dynasty who wanted to set up a pricing tool. Dynasty Sports considers this information to be part of the Trade Secrets.

49.     Other documents previewed, downloaded or accessed by Escoriaza in his final days include Dynasty Sports' highly proprietary information, such as presentations to the company's board of directors and company road maps. These were highly confidential presentations made solely to the company's board members, along with a few other very senior executives. And the roadmaps he accessed showed the development goals and timelines for implementing technology, again highly proprietary and confidential information. Again, Dynasty Sports considers this information to be part of the Trade Secrets.

50.     Escoriaza had no business purposes in accessing these files, and Dynasty Sports never authorized Escoriaza to access these files.

51.     Besides his unauthorized access of files immediately before the end of his employment relationship with Dynasty Sports, on January 3, 2019, Escoriaza registered a new computer with the Azure Active Directory. This process enables a computer to connect to other resources in the corporate environment, whether that computer is directly connected to a company network or via a remote virtual private network. Normally this is done for new employees or for those getting new hardware. Typically, this would facilitate a connection to shared network drives and printers. On Escoriaza's penultimate day at Dynasty Sports, there would be no business purpose for this action.

52.     Escoriaza had no business purpose in registering a new computer with the Azure Active Directory, and Dynasty Sports never authorized Escoriaza to register a new computer.

53.     On January 4, 2019, ***his last day***, Escoriaza sent two more emails to j.alex.esco@gmail.com  containing Confidential Information. The first email contained the IP address of one of Dynasty Sports' servers, which houses important and confidential Dynasty Sports files. The second email contained the password to Dynasty Sports' inventory management

system, as well as passwords to several of Dynasty Sports' database servers. These passwords were for user accounts that Escoriaza had created in order to access data on those databases. The way these accounts were created would have made it easier to avoid routine access logging. Because of the high volume of activity on these various databases, it would be possible using such an account to make information queries without particular security. These accounts provide access to Dynasty Sports' ticket inventory and movement, giving non-public, proprietary information to anyone using that could be used to harm Dynasty Sports or its clients. These systems are extremely proprietary.

54.     Escoriaza had no business purpose in e-mailing anyone this information, and Dynasty Sports never authorized Escoriaza to e-mail this information to anyone.

55.     As noted above, on April 11, 2019, there was a login to the PowerBi Account, at which time it was used to view a report titled "Daily Dashboard tooltip." That document contained proprietary, non-public sales information, including the number of tickets sold, revenue from ticket sales, cost of inventory, and profit year, each on a daily, monthly, and annual basis. It shows the velocity of sales, *i.e.,* how far from a particular event was the company selling tickets. It shows market share by marketplace, information that is highly sought-after and extremely confidential. This data, in the hands of a competitor or client, or just out in the market place, could do tremendous damage to Dynasty Sports. Dynasty Sports considers this information to be part of the Trade Secrets.

56.     Escoriaza now works for a Miami-based professional sports team that is a key client of Dynasty Sports. If Escoriaza were to disclose or use Dynasty Sports' information while working for this team, it could cause substantial damage to Dynasty Sports. For example, once

the team had access to Dynasty Sports' proprietary ticketing data, the team would have a vastly diminished need for Dynasty Sports to provide ticketing services.

57.     On May 28, 2019, an employee with the professional sports team where Escoriaza now works, with whom Dynasty Sports has dealt in the past, reached out to Dynasty Sports to inform Dynasty Sports that the team would be soliciting requests for proposals for companies to provide the ticketing services that Dynasty Sports is currently providing to the team. Dynasty Sports was told that Escoriaza will be running this process and that the people at the team who we previously worked with were not really going to be involved.

## COUNT I – MISAPPROPRIATION OF TRADE SECRETS
## IN VIOLATION OF 18 U.S.C. §§ 1836 & 1839

58.     Dynasty Sports repeats and realleges the allegations in paragraphs 1 through 57.

59.     Dynasty Sports has the rightful legal and equitable right and title to the Trade Secrets, including the volumes of data that Dynasty Sports, through its own efforts, has compiled regarding the secondary ticketing market, as well as how that data is used to conduct its business, along with the proprietary systems and software used to run its business.

60.     Dynasty Sports' Trade Secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce.

61.     The Trade Secrets are financial, business, technical, and economic information that derive independent economic value from not being generally known to, and are not readily ascertainable through proper means by, others who can obtain economic value from the disclosure and use of the Trade Secrets.

62.     The Trade Secrets are a primary asset of Dynasty Sports.

63.     Dynasty Sports took reasonable measures to keep its Trade Secrets secret, including, but not limited to:

    i.    Requiring employees to execute employment agreements containing use and disclosure restrictions;

    ii.    Requiring use of individual usernames and passwords wherever commercially reasonable, including but not limited to all cases involving email or file sharing;

    iii.    Protecting Dynasty Sports' networks with firewalls and virtual private network access for authorized users to gain access to internal resources over the internet;

    iv.    Securing Dynasty Sports' databases by accounts that require authentication and authorization; and

    v.    Having former employees review their responsibilities regarding use and disclosure restrictions, and asking former employees to sign an acknowledgment form acknowledging these responsibilities.

64.     Dynasty Sports did not disclose the Trade Secrets to anyone—including Escoriaza—unless the recipient agreed to keep them confidential.

65.     Escoriaza had access to the Trade Secrets during Escoriaza's employment with Dynasty Sports, and on at least one occasion accessed the Trade Secrets after the termination of his employment.

66.     Escoriaza acquired the Trade Secrets by improper means and outside the scope of his employment with Dynasty Sports, and without the consent of Dynasty Sports.

67.     Escoriaza disclosed and used, and is disclosing and using, the Trade Secrets without Dynasty Sports' express or implied consent.

14

68. At the time of Escoriaza's acquisition, disclosure and use of the Trade Secrets, Escoriaza knew and knows that his knowledge of the Trade Secrets was acquired by improper means and under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets and to limit the use of the Trade Secrets, including pursuant to the Employment Agreement.

69. Dynasty Sports has suffered and is suffering damages because of Escoriaza's misappropriation of the Trade Secrets.

WHEREFORE, Dynasty Sports requests that the Court grant it: (1) a judgment against Escoriaza for all damages, including (a) actual damages, unjust enrichment damages, and/or reasonable royalty damages, and (b) exemplary damages; (2) its reasonable attorney's fees and costs, pursuant to 18 U.S.C. § 1836(b)(3)(D); (3) pre- and post-judgment interest; and (4) such other and further relief as this Court deems necessary and just. Dynasty Sports is contemporaneously seeking a civil seizure order pursuant to 18 U.S.C. § 1836(b)(2).

## COUNT II – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF § 688.001, *et seq.*, FLORIDA STATUTES

70. Dynasty Sports repeats and realleges the allegations in paragraphs 1 through 57.

71. Dynasty Sports has trade secrets, including the Trade Secrets.

72. The Trade Secrets are information that derive independent economic value from not being generally known to, and are not readily ascertainable through proper means by, others who can obtain economic value from the disclosure and use of the Trade Secrets.

73. The Trade Secrets are a primary asset of Dynasty Sports.

74. Dynasty Sports took reasonable measures to keep its Trade Secrets secret, including, but not limited to:

    i.    Requiring employees to execute employment agreements containing use and disclosure restrictions;

    ii.    Requiring use of individual usernames and passwords wherever commercially reasonable, including but not limited to all cases involving email or file sharing;

    iii.    Protecting Dynasty Sports' networks with firewalls and virtual private network access for authorized users to gain access to internal resources over the internet;

    iv.    Securing Dynasty Sports' databases by accounts that require authentication and authorization; and

    v.    Having former employees review their responsibilities regarding use and disclosure restrictions, and asking former employees to sign an acknowledgment form acknowledging these responsibilities.

75.    Dynasty Sports did not disclose the Trade Secrets to anyone—including Escoriaza—unless the recipient agreed to keep them confidential.

76.    Escoriaza had access to the Trade Secrets during Escoriaza's employment with Dynasty Sports, and on at least one occasion accessed the Trade Secrets after the termination of his employment.

77.    Escoriaza acquired the Trade Secrets by improper means and outside the scope of his employment with Dynasty Sports, and without the consent of Dynasty Sports.

78.    Escoriaza disclosed and used, and is disclosing and using, the Trade Secrets without Dynasty Sports' express or implied consent.

79.    At the time of Escoriaza's acquisition, disclosure and use of the Trade Secrets, Escoriaza knew and knows that his knowledge of the Trade Secrets was acquired by improper

means and under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets and to limit the use of the Trade Secrets, including pursuant to the Employment Agreement.

80.     Dynasty Sports has suffered and is suffering damages because of Escoriaza's misappropriation of the Trade Secrets.

WHEREFORE, Dynasty Sports requests that the Court grant it: (1) a judgment against Escoriaza for all damages, including (a) actual damages, unjust enrichment damages, and/or reasonable royalty damages, and (b) exemplary damages; (2) its reasonable attorney's fees and costs, pursuant to Section 688.005, Fla. Stat.; (3) pre- and post-judgment interest; and (4) such other and further relief as this Court deems necessary and just.

## COUNT III – INJUNCTIVE RELIEF – BREACH OF EMPLOYMENT AGREEMENT

81.     Dynasty Sports repeats and realleges the allegations in paragraphs 1 through 57.

82.     Dynasty Sports and Escoriaza entered into the Employment Agreement, a valid and binding agreement.

83.     Pursuant to the Employment Agreement and as part of Escoriaza's employment, Escoriaza had access to and was provided Dynasty Sports' Confidential Information and the Trade Secrets.

84.     Among other things, the Employment Agreement required Escoriaza to keep the Confidential Information and the Trade Secrets confidential, including by using the Confidential Information and Trade Secrets only in the performance of his duties for Dynasty Sports, by precluding Escoriaza from using and disclosing the Confidential Information and Trade Secrets both during and after his employment with Dynasty Sports, requiring Escoriaza to take reasonably necessary actions to protect against the disclosure of the Confidential Information and Trade Secrets, and requiring Escoriaza to return or destroy all materials in any way relating to

17

the Confidential Information and Trade Secrets upon his termination of employment with Dynasty Sports.

85.     Escoriaza breached the Employment Agreement, including without limitation by:

i.     Accessing the Confidential Information and Trade Secrets after the termination of his employment with Dynasty Sports;

ii.    Using and disclosing the Confidential Information and Trade Secrets for his own personal benefit and outside the scope and term of his employment with Dynasty Sports;

iii.   Failing to take reasonably necessary actions to protect the Confidential Information and Trade Secrets from disclosure to persons or entities other than those authorized by Dynasty Sports; and

iv.    Not returning and/or destroying all materials in any way relating to the Confidential Information and Trade Secrets following the termination of his employment with Dynasty Sports.

86.     Escoriaza's obligations under the Employment Agreement were and are continuing and perpetual in nature; there are no temporal limitations on Escoriaza's obligations.

87.     Dynasty Sports has a clear legal right to an injunction pursuant to Paragraph 4.2 of the Non-Disclosure Agreement.

88.     Dynasty Sports has a legitimate business interest in protecting its Confidential Information and Trade Secrets, which are trade secrets and/or valuable confidential information not rising to the level of a trade secret.

89.     The Employment Agreement is reasonable in scope and duration.

18

90.     Dynasty Sports has sustained, and continues to sustain, irreparable injury as a result of Escoriaza's violation of the Employment Agreement.

91.     Dynasty Sports lacks an adequate remedy at law, such as monetary damages, to compensate Dynasty Sports and prevent Escoriaza's use and disclosure of the Confidential Information and Trade Secrets.

92.     Upon consideration of the balance of hardships between Dynasty Sports and Escoriaza, a remedy in equity is warranted.

93.     The public interest will not be disserved by the entry of an injunction.

WHEREFORE, Dynasty Sports requests that the Court enter a judgment against Escoriaza for injunctive relief pursuant to the Employment Agreement, along with an award of its reasonable attorney's fees and costs, and such other and further relief as this Court deems necessary and just.

## COUNT IV – VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT

94.     Dynasty Sports repeats and realleges the allegations in paragraphs 1 through 57.

95.     Dynasty Sports' computer systems and databases comprise a protected computer that is used across state lines in interstate and/or foreign commerce and communication.

96.     Through the above-described actions, by accessing Dynasty Sports' computer systems and database for non-business-related purposes and outside the performance of his duties for Dynasty Sports, Escoriaza exceeded his authorized access and/or accessed Dynasty Sports' computer system and database without authorization and for his own benefit and possibly the benefit of his current employer, a client of Dynasty Sports.

97.     Through the above-described actions, Escoriaza has:

    i.    Intentionally accessed a computer without authorization or exceeded his authorized access to obtain information from a protected computer in violation of 18 U.S.C. § 1030(a)(2)(C);

    ii.    Knowingly and with intent to defraud, accessed a protected computer without authorization or exceeded his authorization access, and by means of such conduct furthered the intended fraud and obtained valuable information resulting in damages exceeding $5,000 in violation of 18 U.S.C. § 1030(a)(4); and

    iii.    Intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damage and loss in violation of 18 U.S.C. § 1030(a)(5)(C).

98.    Dynasty Sports has suffered losses in excess of $5,000 in a one-year period, including, without limitation, the costs of engaging a forensics firm to respond to Escoriaza's offenses and to analyze and assess the extent of Escoriaza's wrongful taking of information from Dynasty Sports' computers and databases.

99.    As a result of Escoriaza's actions, Dynasty Sports has suffered and continues to suffer monetary damages.

WHEREFORE, Dynasty Sports requests that the Court grant it: (1) a judgment against Escoriaza for compensatory damages; (2) pre- and post-judgment interest; and (3) such other and further relief as this Court deems necessary and just.

## JURY DEMAND

Dynasty Sports demands a jury trial for all claims so triable.

Dated:  June 3, 2019.

Respectfully submitted,

/s/Eric Ostroff
Eric Ostroff
Fla. Bar No. 10130
eostroff@melandrussin.com
Meaghan E. Murphy
Florida Bar No. 102770
mmurphy@melandrussin.com
MELAND, RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221

*Attorneys for Dynasty Sports*