IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:19-cv-22261-BB

CRUBIN, LLC, a Florida
limited liability company,

    Plaintiff,

v.

JESUS "ALEX" ESCORIAZA, an
individual,

    Defendant.
_____/

**PLAINTIFF'S EMERGENCY MOTION FOR**
***EX PARTE* SEIZURE AND EVIDENCE PRESERVATION**
**ORDER AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to the Defend Trade Secrets Act ("***DTSA***"), 18 U.S.C. § 1836(b)(2), Plaintiff CRubin LLC ("***Dynasty Sports***"), respectfully submits its Emergency Motion for *Ex Parte* Seizure and Evidence Preservation Order and Incorporated Memorandum of Law (the "***Motion***"). As set forth below, the nature of the emergency is that Dynasty Sports has reason to believe that the Defendant, Jesus "Alex" Escoriaza ("***Escoriaza***"), is actively using and disclosing Dynasty Sports' trade secrets and confidential information, which he misappropriated both during and after his employment, to compete with Dynasty Sports. If a client or competitor has Dynasty Sports' confidential information, it can use that information to replicate Dynasty Sports' systems or processes, ruining Dynasty Sports' business. Dynasty Sports respectfully requests a ruling by June 5, 2019 to avoid, to the extent possible, immediate and irreparable harm to Dynasty Sports if its confidential information and trade secrets are being actively used and disclosed by Escoriaza.

    **I.**    **INTRODUCTION**

Dynasty Sports acknowledges that an *ex parte* seizure is an extraordinary remedy. But this case presents extraordinary circumstances. Dynasty Sports seeks limited *ex parte* seizure and evidence-preservation orders to ensure preservation of evidence showing misappropriation of trade secrets, a remedy provided for under the recently enacted DTSA. Specifically, Dynasty

1

Sports seeks an order allowing a Court-appointed technical expert to copy and deliver to the Court, for preservation, electronic files in Defendant Jesus "Alex" Escoriaza's ("*Escoriaza*") possession. Dynasty Sports has good cause to believe that these files contain (a) Dynasty Sports' trade secrets and (b) voluminous evidence proving Escoriaza's past and ongoing misappropriation of those trade secrets. There is a grave risk that Escoriaza will destroy this evidence if given notice prior to its seizure.

As detailed below, Dynasty Sports is an industry-leading provider of ticket inventory management, ticket-pricing optimization, and ticket data and analytics, among other services, to professional sports teams, venues, ticketing providers, and other entities involved in professional sports. Escoriaza was one of Dynasty Sports' first employees, and he was responsible for building the company's IT infrastructure. He is extremely sophisticated in IT matters and has unique knowledge about Dynasty Sports' IT systems.

Dynasty Sports has learned that (1) when Escoriaza worked at Dynasty Sports, (2) as he prepared to leave the company (including on his last day), and (3) since he left the company, Escoriaza used his unique knowledge about Dynasty Sports' IT infrastructure and proprietary business practices to surreptitiously access, view, and download highly proprietary, trade-secret information. Given his IT sophistication and the devious means he used to access and obtain this information unlawfully, there is an extreme risk that, upon being served with this lawsuit, he will destroy the electronic bread crumbs proving his illegal conduct.

## II. RELIEF SOUGHT

In this Motion, Dynasty Sports seeks very limited *ex parte* relief.[1] It does not seek seizure of actual electronic devices or deletion of any information or files on those devices. The proposed seizure is limited to making forensic-quality images from computer and mobile devices used or controlled by Escoriaza, to preserve evidence found on the devices. The copied files would remain in the Court's possession. Dynasty Sports would not be able to access those files until further order of Court, after Escoriaza has had a chance to respond. Thus, the proposed seizure and preservation orders are narrowly tailored to minimize any impact on Escoriaza's

---

[1] Dynasty Sports is contemporaneously filing an Emergency *Ex Parte* Motion for Temporary Restraining Order. That motion seeks to prohibit Escoriaza from further use of Dynasty Sports' trade secrets and confidential information.

legitimate personal or business operations, and the only burden on him will be the short time required to make copies of the files from computer devices.

Dynasty Sports further requests appointment by the Court of a digital-forensics expert with expertise in identifying and imaging or copying data and digital files to carry out the requested seizure, alongside the United States Marshals Service. This technical expert would not be affiliated with Dynasty Sports or Escoriaza and would be bound by a Court-approved non-disclosure agreement. Dynasty Sports respectfully suggests that a technical expert from Xact Data Discovery, Peter Vazquez (or such other person with Xact Data Discovery as may be appropriately determined by it), a company with prior experience collecting this type of data pursuant to an *ex parte* seizure order, be appointed by the Court as a technical expert. Xact Data Discovery is not affiliated with Dynasty Sports or undersigned counsel, and upon information and belief, is not affiliated with Escoriaza.

### III.   FACTS SUPPORTING *EX PARTE* RELIEF

The relevant facts supporting this application are as follows and are detailed in the Affidavits of David Thompson, David O'Neil and Stuart Halberg, attached as **Exhibits "A," "B,"** and **"C,"** respectively.

#### A. Dynasty Sports' Trade Secrets and Confidential Information.

Dynasty Sports is an industry-leading provider of ticket inventory management, ticket pricing optimization, and ticket data and analytics, among other services, to professional sports teams, venues, ticketing providers, and other entities involved in professional sports. Halberg Aff., ¶ 3. Dynasty Sports' goal is to work with its clients to maximize their revenue from ticket sales. *Id.*

Dynasty Sports' trade secrets include the volumes of data that Dynasty Sports, through its and its wholly owned subsidiaries' efforts, has compiled regarding the ticketing market, as well as how that data is used to conduct its business, along with proprietary software and systems it uses to operate its business (the "***Trade Secrets***"). Dynasty Sports' Trade Secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce. The Trade Secrets are financial, business, technical, and economic information that derive independent economic value from not being generally known to, and are not readily ascertainable through proper means by, others who can obtain economic value from the disclosure and use of the Trade Secrets. The Trade Secrets are a primary asset of Dynasty Sports, without which it could not

function. If the Trade Secrets were shared with Dynasty Sports' competitors or clients, it could ruin Dynasty Sports' business. Halberg Aff., ¶ 5.

Escoriaza worked at Dynasty Sports from October 8, 2012 to January 4, 2019. For the last several years of his employment, he served as one of Dynasty Sports' Vice Presidents, a senior position. Halberg Aff., ¶ 8. Escoriaza has substantial knowledge about information technology. As part of his work as an employee of Dynasty Sports, Escoriaza was largely responsible for building and maintaining Dynasty Sports' information technology infrastructure. Thus, Escoriaza was and is extremely knowledgeable about Dynasty Sports' technology systems, business processes, and data, and had access to Dynasty Sports' confidential and proprietary information, including the Trade Secrets. Halberg Aff., ¶ 11. In addition, Escoriaza has extensive, unique knowledge about Dynasty Sports' business from an operations and accounting standpoint. *Id.*

During Escoriaza's employment with Dynasty Sports, he and Dynasty Sports entered into a series of employment agreements, including but not limited to: On or about October 19, 2016, an Employee Agreement (the "***First Employee Agreement***"); on or about November 16, 2012, an Employee Non-Compete Agreement (the "***Non-Compete Agreement***"); on or about January 1, 2017, an updated Employee Agreement (the "***Second Employee Agreement***"); and on or about May 14, 2018, an Employee Non-Disclosure and Invention Assignment Agreement, which amended only to the extent therein the Second Employment Agreement (the "***Non-Disclosure Agreement***" and together with the Second Employee Agreement, the "***Employment Agreement***"). Halberg Aff., ¶ 9 & Ex. 1-4.

Among other things, the Employment Agreement restricted the disclosure and use of Dynasty Sports' confidential and proprietary information (the "***Confidential Information***") and Trade Secrets. *See* Halberg Aff. Ex. 4, § 2. On his final day, he signed an Acknowledgment, in which he expressly acknowledged his post-employment obligations. *See id.,* ¶ 9 & Ex. 1-4 & Ex. 5.

**B.  Dynasty Sports Takes Reasonable Measures to Protect Its Trade Secrets.**

Dynasty Sports takes a number of measures to protect its Trade Secrets, including, without limitation, requiring employees to execute employment agreements containing use and disclosure restrictions, and requiring use of individual usernames and passwords, including but not limited to all cases involving email or file sharing. Halberg Aff., ¶ 6. Where it is necessary to

use a shared account, such as machine accounts, Dynasty Sports requires use of a password archive that it itself secured to individual, permitted access, and exceptions are limited to operational and information technology systems where it is impractical to have an individual user credential running software processes on a server. *Id.* Additionally, Dynasty Sports' networks are protected by firewalls with virtual private network access for authorized users to gain access to internal resources over the internet, and Dynasty Sports' databases are secured by accounts that require authentication and authorization. *Id.*

Dynasty Sports continues to take reasonable measures to protect its Trade Secrets once employees leave. Halberg Aff., ¶ 7. The company disables former employees' accounts and/or resets their passwords, as appropriate. *Id.* Departing employees are also asked to sign acknowledgment forms, wherein they re-acknowledge their responsibilities with regard to use and disclosure restriction; even if a departing employee refuses to sign an acknowledgement form, Dynasty Sports still reviews these procedures with them to provide a reminder and notice of their responsibilities. *Id.* As discussed above, Escoriaza signed this document. Halberg Aff., ¶ 9 & Ex. 5.

### C. Escoriaza Misappropriated Dynasty Sports' Trade Secrets and Used and Disclosed Dynasty Sports' Confidential Information

In late March 2019, as part of routine auditing, Dynasty Sports' Chief Technology Officer, David Thompson, noticed that a Dynasty Sports account that was used for analytics and data warehousing and also configured to be used for email, powerbi@dynastyse.com (the "***PowerBi Account***"), was configured to give that account "read and manage" access to the email accounts of Cole Rubin, Dynasty Sports' CEO and Director; Jon Katz, COO and Director; Carlyle Kirkpatrick, former CFO; and Michael Freiburghouse, Controller. In other words, whoever logged in to the PowerBi Account could read all of these individuals' emails and control their email accounts, such as by moving and deleting emails. The users would not have been aware of this access. This was highly irregular and caused Thompson great concern. Thompson Aff., ¶ 4. At that point, Thompson began investigating. *Id.,* ¶ 5. At no point had Dynasty Sports authorized Escoriaza or anyone else to give the PowerBi Account this access to these senior executives' email accounts. Halberg Aff., ¶ 12. As part of this investigation, Dynasty Sports hired Kudelski Security, an outside computer forensics firm, and this Motion attaches the affidavit of David O'Neal of Kudelski Security. This investigation led to the

discovery of Escoriaza's unlawful conduct, motivated by his intent to steal and use for his benefit Dynasty Sports' Trade Secrets and Confidential Information.

On December 21, 2018, Escoriaza gave Dynasty Sports notice that he would be leaving the company. Halberg Aff., ¶ 8. His final day was January 4, 2019. *Id.* As part of its investigation, Dynasty Sports recently learned that in the days leading up to Escoriaza's final day of employment with Dynasty Sports, Escoriaza sent to his personal Gmail account, [j.alex.esco@gmail.com](j.alex.esco@gmail.com), emails containing Dynasty Sports' Confidential Information and Trade Secrets.

On December 10, 2018 and again on December 18, 2018, Escoriaza emailed his personal Gmail account Trade Secrets, consisting of a significant amount of sales data. Thompson Aff., ¶ 9. This sales data is extremely valuable, highly confidential information, and Escoriaza had no business purpose in sending these emails. Halberg Aff., ¶ 19.

On December 19, 2018, Escoriaza emailed his personal Gmail account Confidential Information, including Dynasty Sports' master American Express credit card number and four-digit CVV code, as well as the username and password to a client's college football playoff ticket account. Thompson Aff., ¶ 10.

On December 26, 2018, Escoriaza emailed his personal Gmail account Trade Secrets consisting of a purchase-order template that Dynasty Sports uses to load inventory into its system. Thompson Aff., ¶ 11.

On January 3, 2019, Escoriaza's account registered a new computer to Dynasty Sports' Azure Active Directory. This process enables a computer to connect to other resources in the corporate environment, whether that computer is directly connected to a company network or via a remote virtual private network. Normally this is done for new employees or for those getting new hardware. Typically, this would facilitate a connection to shared network drives and printers. On Escoriaza's penultimate day at Dynasty Sports, there would be no business purpose for this action. Thompson Aff., ¶ 14.

On January 4, 2019, **his last day**, Escoriaza sent two more emails to his personal Gmail account containing Confidential Information. The first email contained the IP address of one of Dynasty Sports' servers, which houses important and confidential Dynasty Sports files. Thompson Aff., ¶ 12. The second email contained the password to Dynasty Sports' inventory management system, as well as passwords to several of Dynasty Sports' database servers. *Id*.

These passwords were for user accounts that Escoriaza had created to access data on those databases. *Id.* The way Escoriaza created these accounts would have made it easier to avoid routine access logging. *Id.* Because of the high volume of activity on these various databases, it would be possible using such an account to make information queries without particular scrutiny. *Id.* These accounts provide access to Dynasty Sports' ticket inventory and movement, containing non-public, proprietary information that could be used to harm Dynasty Sports or its clients. These systems are extremely proprietary. *Id.* Escoriaza had no business purpose for sending these emails. Thompson Aff., ¶ 13. ***By sending himself these emails, as well as through the other conduct detailed herein, Escoriaza—unbeknownst to Dynasty Sports—maintained the ability to access Dynasty Sports' systems after he left and his account was disabled.*** *Id.*

Dynasty Sports uses Microsoft Office 365's OneDrive, which utilizes a "file-based operation" log that shows when a user previewed, downloaded or accessed a file. O'Neil Aff., ¶ 6. Between December 27, 2018 and January 4, 2019, Escoriaza's last day of employment with Dynasty Sports, Escoriaza previewed, downloaded or accessed 411 files, many of which contain Dynasty Sports' Trade Secrets and Confidential Information. O'Neil Aff., ¶ 7; Halberg Aff., ¶ 24.

For example, Escoriaza downloaded a document titled "Monarch User Administration," which contained information about Dynasty Sports' pricing tool used to determine the appropriate price for tickets on the secondary market. This tool is critical to Dynasty Sports' business. Halberg Aff., ¶ 25. The document contained proprietary, nonpublic information about how the pricing tool is set up, including how it functions as both a reporting tool and a pricing dashboard. *Id.* Other documents accessed, viewed, or downloaded by Escoriaza include highly proprietary information, such as presentations to the company's board of directors and company roadmaps. Halberg Aff., ¶ 26. These presentations were highly confidential and made solely to board members and a few senior executives. *Id.* The roadmaps showed development goals and timelines for implementing technology, again, highly proprietary and confidential information. *Id.* All of the documents described in this paragraph contain Dynasty Sports' Trade Secrets and Confidential Information.

Dynasty Sports also investigated the PowerBi Account. It was connected to Escoriaza's personal Gmail account, j.alex.esco@gmail.com, which was listed as the recovery email associated with the PowerBi Account. *Id.,* ¶ 6. Additionally, Internet Protocol (or IP) addresses

connect Escoriaza to the PowerBi Account before and after he left Dynasty Sports. An IP address is a unique string of numbers that identifies each computer using the Internet Protocol to communicate over a network. O'Neal Aff., ¶ 16. On April 11, 2019, there were eight failed attempts to login to Escoriaza's email account made from the IP address 172.11.274.111 (by then, his email account had been disabled). That day and on other occasions following the end of Escoriaza's employment with Dynasty Sports, the very same IP address accessed the PowerBi Account. O'Neil Aff., ¶¶ 17, 20. ***This IP address was only used to login to Escoriaza's email account and the PowerBi Account; there was no login activity from this IP address for any other Dynasty Sports accounts***, supporting the conclusion that Escoriaza has been logging into the PowerBi Account, including after the end of his employment. O'Neil Aff., ¶ 17.

Once logged in to the PowerBi Account, Escoriaza could monitor the emails of Dynasty Sports' senior executives. O'Neil Aff., ¶ 18.

Besides having the unauthorized "read and manage" access to the senior executives' email accounts discussed above, there was other suspicious activity concerning the PowerBi Account. On April 11, 2019, months after Escoriaza's employment with Dynasty Sports ended, the PowerBi Account accessed a report titled "Daily Dashboard tooltip." O'Neil Aff., ¶ 19. That document contains proprietary, non-public sales information and Dynasty Sports' Trade Secrets. Halberg Aff., ¶ 27. For example, this document shows the number of tickets sold, revenue from ticket sales, cost of inventory, and profit year, each on a daily, monthly, and annual basis. *Id.* It shows the velocity of sales, *i.e.,* how far from a particular event was the company selling tickets. *Id.* It shows market share by marketplace, information that is highly sought-after and extremely confidential. *Id.* This data, in the hands of a competitor or client, or just out in the market place, could do tremendous damage to Dynasty Sports. *Id.*

Besides the PowerBi Account, while at Dynasty Sports, Escoriaza gave his Dynasty Sports email account "Full Access" permission to the email accounts of former employees Ana Manzaneres and Tim Goldenstein. O'Neil Aff., ¶ 9. In turn, Tim Goldenstein's email account had "Full Access" permission to the email account of employee Daniel Dadi. *Id.* This is in addition to the PowerBi Account's access to senior executives' email accounts. In his role for Dynasty Sports, Dadi would have constant access to very valuable sales data. Halberg Aff., ¶ 16.

This email activity was highly suspicious. For at least some period of time, Ms. Manzanares and Escoriaza had a romantic relationship. Halberg Aff., ¶ 14. Upon information

8

and belief, they are still dating. Ms. Manzaneres' employment with Dynasty Sports ended in April 2018, and her system account (including email access) was disabled in 2018. Thompson Aff., ¶ 7. But her system account was reactivated in 2019, despite there being no business reason for reactivating this account. *Id.* There was no business purpose for Escoriaza to have "Full Access" permission to Ms. Manzanares' email account. Dynasty Sports never authorized the Defendant's access to this account. Halberg Aff., ¶ 17. On January 10 and 11, 2019, there were 51 successful logins to Ms. Manzaneres' Dynasty Sports system account. O'Neil Aff., ¶ 13.

Mr. Goldenstein worked as a database engineer, and passed away suddenly in October 2017. Halberg Aff., ¶ 15. Mr. Dadi is a pricing manager at Dynasty Sports, and a shared resource with the company's data team. Halberg Aff., ¶ 16. There was no business purpose for Escoriaza or Mr. Goldenstein to have access to Mr. Dadi's email account, and Dynasty Sports never authorized such access. *Id.*

In sum, while at Dynasty Sports, Escoriaza, without authority, gave himself access to other employees' email accounts. He set up the PowerBi Account, which had inappropriate access to the company's most senior executives' email accounts. In his last week at the company, he viewed, downloaded, or emailed to his personal Gmail account hundreds of files containing Trade Secrets and Confidential Information to his personal email address, along with access credentials, IP addresses, and the company's credit card number. Once he left, he continued to access Dynasty Sports' system, through his own email account and the PowerBi Account, at a minimum.

Escoriaza now works for a Miami-based professional sports team[2] that is a key client of Dynasty Sports. If Escoriaza were to disclose or use Dynasty Sports' information while working for this team, it could cause substantial damage to Dynasty Sports. For example, once the team had access to Dynasty Sports' proprietary ticketing data, the team would have a vastly diminished need for Dynasty Sports to provide ticketing services. Halberg Aff., ¶ 28.

On May 28, 2019, an employee with the Miami-based professional sports team where Escoriaza now works, with whom Dynasty Sports has dealt in the past, reached out to Dynasty Sports to inform Dynasty Sports that the team would be soliciting requests for proposals for

---

[2] Dynasty Sports is not naming this team in this Motion, as Dynasty Sports has no reason to believe that the team is aware of Escoriaza's wrongful conduct.

companies to provide the ticketing services that Dynasty Sports is currently providing to the team. Dynasty Sports was told that Escoriaza will be running this process and that the people at the team who Dynasty Sports previously worked with were not really going to be involved. *Id.,* ¶ 29.

## IV.  MEMORANDUM OF LAW

### A.  The *Ex Parte* Seizure Order

Pursuant to the DTSA, a court may issue an *ex parte* order "providing for the seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action." 18 U.S.C. § 1836(b)(2)(A)(i). The Court may issue an *ex parte* seizure order if it finds "it clearly appears from specific facts that":

1)  an order issued pursuant to Rule 65 or another form of equitable relief would be inadequate;

2)  an immediate and irreparable injury will occur without the seizure;

3)  harm to the applicant of denying the application outweighs the harm to the legitimate interests of the defendant and substantially outweighs the harm to any third parties who may be harmed by such seizure;

4)  the applicant is likely to succeed in showing that the information is a trade secret and the defendant misappropriated the trade secret or conspired to use improper means to misappropriate the trade secret;

5)  the person against whom the seizure would be ordered has actual possession of the trade secret and any property to be seized;

6)  the application describes with reasonable particularity the matter to be seized;

7)  if given notice, defendant would destroy, move, hide, or otherwise make such matter inaccessible to the court; and

8)  the applicant has not publicized the requested seizure.

18 U.S.C. § 1836(b)(2)(A)(ii)(I)–(VIII).

The DTSA is a new statute. Thus, there are few cases providing information on previous *ex parte* seizure applications, and some such cases are sealed. In a 2018 case in the District of Utah, however, Plaintiff Solar Connect, LLC requested an *ex parte* seizure under the DTSA, and the Court entered an order granting the motion. *See Solar Connect, LLC v. Endicott*, 2018 WL

2386066 (D. Utah 2018). A copy of the *ex parte* seizure order issued in the *Solar Connect* case is attached as **Exhibit "D."** In the order for *ex parte* seizure and preservation of evidence, the court found that "relief other than *ex parte* seizure would be inadequate to achieve the purpose of preserving digital files and data containing Solar Connect's trade secrets and evidence of misappropriation." Ex. D at *2. The order went on to state that, in that case, "the Defendants have a high level of technical proficiency" and a "willingness to hide information and move computer files[.]" *Id.* Further, the order in *Solar Connect* was limited to making copies of files and data on the defendant's computer devices, and did not require seizure of the physical items that held the trade secrets for any longer than necessary to make such copies. *Id.* at *3.

*Solar Connect* is instructive here. Escoriaza has a high level of computer and technical proficiency. And he took specific, specialized measures to hide his misappropriation of the Trade Secrets, including using the PowerBi Account and surreptitiously granting himself "read and manage" access to employee and executive email accounts. Escoriaza is fully capable of destroying, moving or hiding evidence upon notice of any pending legal action. Further, like in *Solar Connect*, the *ex parte* order requested here is limited to making copies of evidence found on Escoriaza's computer devices and does not require removing from Escoriaza's possession the computer devices or other physical items containing Dynasty Sports' Trade Secrets and evidence of misappropriation any longer than necessary to make copies of the hard drives.

Dynasty Sports recognizes that an *ex parte* seizure order is extraordinary relief. But this case presents extraordinary circumstances, for which a near-unanimous Congress[3] provided this remedy to protect a victim of trade-secrets theft, like Dynasty Sports.

      i.  **Dynasty Sports Satisfies the DTSA's Requirements.**

          a.  **Escoriaza Will Likely Not Comply with an Order for Preliminary or Permanent Injunction.**

As in *Solar Connect*, *ex parte* relief is essential because, if Dynasty Sports were to give Escoriaza prior notice, there is an extraordinary risk that he would delete, move, or obscure the Trade Secrets and evidence of misappropriation in his possession to avoid preservation and production of incriminating evidence. Escoriaza would likely easily evade, avoid, or otherwise

---

[3]     The Senate passed the DTSA 87-0, and the House passed the DTSA 410-2. *See* https://www.govtrack.us/congress/votes/114-2016/s39 & https://www.govtrack.us/congress/votes/114-2016/h172, both visited on June 2, 2019.

not comply with such an order and it may be impossible to discover his non-compliance due to Escoriaza's technical sophistication. *See* O'Neal Aff., ¶ 23.

Escoriaza's past conduct demonstrates that an order issued pursuant to Rule 65 or another form of equitable relief would be inadequate to preserve files containing Dynasty Sports' Trade Secrets and evidence of misappropriation. Escoriaza used his technical proficiency to take specialized, calculated measures to hide his misappropriation of the Trade Secrets, as discussed above. Escoriaza's established record of deception—including manipulating Dynasty Sports' IT systems so that he would maintain access after the company terminated his account—demonstrates that he would likely not comply with an order for preliminary or permanent injunction, and an *ex parte* seizure is required to preserve evidence relating to Escoriaza's misappropriation.

### b. Dynasty Sports Will Suffer Immediate and Irreparable Harm if a Seizure is not Ordered by the Court.

The purpose of the *ex parte* seizure provisions of the DTSA is to provide expedited relief on an *ex parte* basis to preserve evidence of misappropriation or prevent further dissemination of a trade secret. Congress designed the *ex parte* seizure provision for precisely the circumstances here. As noted in the DTSA's legislative history:

> The *ex parte* seizure provision is an important remedy for trade secret owners because it "enable[s] a trade secret owner under limited, controlled conditions, to proactively contain a theft before it progresses and the trade secret is lost." . . . The new Sec. 1836(b) authorizes a Federal court to issue an order, in extraordinary circumstances and upon an *ex parte* application based on an affidavit or verified complaint, to provide for seizure of property necessary to preserve evidence or to prevent the propagation or dissemination of the trade secret.

S. Rep. No. 114-220, Defend Trade Secrets Act of 2016, at 3 (Mar. 7, 2016).

The full nature and extent of the harm already suffered by Dynasty Sports is uncertain, because Dynasty Sports does not yet know what Escoriaza has done with Dynasty Sports' Trade Secrets. But Escoriaza is currently working for a Miami-based professional sports franchise, one of Dynasty Sports' key clients. There is a serious and immediate risk that Dynasty Sports will suffer irreparable harm if Escoriaza uses this information to benefit his current employer. As stated by Judge Rosenbaum in *All Leisure Holidays Ltd. v. Novello*, 12-62328-CIV, 2012 WL 5932364, at *5 (S.D. Fla. Nov. 27, 2012), "in the case of misappropriated trade secrets, the harm is properly characterized as irreparable because an inadequate remedy at law is presumed."

Given the Trade Secrets' value, there is a serious and immediate risk that, absent the requested relief, Escoriaza will cover up his misappropriation, destroy evidence, and move or hide the Trade Secrets and other incriminating evidence. Escoriaza has a high level of computer and technical proficiency and is abundantly capable of destroying, moving or hiding evidence within minutes upon notice of any pending legal action. *See* O'Neil Aff., ¶ 23. Accordingly, Dynasty Sports has shown that it will suffer immediate and irreparable harm if the Court does not order seizure. Congress enacted the DTSA and its seizure remedy to prevent this very type of harm.

### c. The Balance of Harms Weighs Decisively in Dynasty Sports' Favor.

Absent relief, Escoriaza could easily delete the likely voluminous evidence of his misappropriation, thereby undermining Dynasty Sports' claims. He could also easily move the Trade Secrets in his possession to another device, from which he could continue to use them, causing devastating harm to Dynasty Sports. On the other hand, the only burden to Escoriaza would be the short time required for the Court-appointed technical expert to copy files from Escoriaza's computer devices. The copied files containing the Trade Secrets would remain in the Court's custody; Dynasty Sports will not have access to this information until after Escoriaza appears in this action, and then only after order of Court. None of Escoriaza's computer devices or physical items will be taken from him or removed from his possession, as the copying of files would be performed at the location where Escoriaza keeps his computer devices.

The copying of digital files from Escoriaza's computer devices containing Dynasty Sports' Trade Secrets and evidence of misappropriation would also not harm any third parties, particularly where, as here, the copied files will remain in the custody of the Court.

Under similar circumstances in *Solar Connect*, where the defendant was only temporarily deprived of his property while forensic images were being created, the District Court of Utah determined that the balance of harms weighed in favor of the plaintiff. *Solar Connect,* 2018 WL 2386066, at *2. The same applies here.

### d. Dynasty Sports is Likely to Succeed in Showing Escoriaza Misappropriated Dynasty Sports' Trade Secrets.

Dynasty Sports is likely to succeed in showing that Escoriaza misappropriated the Trade Secrets using improper means. The DTSA provides broad protection for trade secrets, which are defined under the DTSA to include "[a]ll forms and types of financial, business, scientific,

technical, economic, or engineering information[.]" 18 U.S.C. § 1839(3). The DTSA protects this information as a trade secret if (a) the owner has taken reasonable measures to keep it secret, and (b) the information derives economic value by virtue of it not being known. *See* 18 U.S.C. § 1839(3)(A)–(B).

Dynasty Sports' Trade Secrets constitute trade secrets under the DTSA. For example, Dynasty Sports' confidential sales data that Escoriaza improperly accessed and emailed to himself constitutes protected business information described in the definition of a trade secret under the DTSA. The Trade Secrets are critical to Dynasty Sports' business and would be incredibly valuable to a competitor.

As discussed above, the Trade Secrets are not readily ascertainable by the public. The Trade Secrets' secrecy affords significant economic value and benefit to Dynasty Sports over its competitors. Because of Dynasty Sports' unique data, software, and systems, clients are willing to pay for Dynasty Sports' services. And Dynasty Sports took reasonable measures to protect the Trade Secrets, as described above.

The DTSA prohibits both the unlawful acquisition of a trade secret and its disclosure. 18 U.S.C. § 1839(5)(A)–(B). Under an acquisition theory, misappropriation means, "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A). Escoriaza misappropriated the Trade Secrets when he acquired them through improper means and outside the scope of his employment, *i.e.,* by emailing the Trade Secrets to his personal Gmail account and viewing, accessing and/or downloading the Trade Secrets in the days leading up to and following the end of his employment. Escoriaza knew or certainly had reason to know that his acquisition of the Trade Secrets was improper. Escoriaza took the Trade Secrets from Dynasty Sports without authorization and, upon information and belief, with the intention of competing against Dynasty Sports. Halberg Aff., ¶¶ 28-29. Further, Escoriaza knew he was subject to the Employment Agreement with Dynasty Sports and signed an acknowledgment of those obligations upon his departure. He knew or should have known that the above acquisition of Dynasty Sports' Trade Secrets was a breach of the Employment Agreement, which constitutes improper means.

Thus, Dynasty Sports is likely to succeed in showing that Escoriaza misappropriated Dynasty Sports' Trade Secrets.

### e. Dynasty Sports is Likely to Succeed in Showing that Escoriaza Has Actual Possession of the Misappropriated Trade Secrets.

Escoriaza has actual possession of the Trade Secrets and files containing the Trade Secrets. As set forth above, immediately prior to and on his last day of employment with Dynasty Sports, Escoriaza emailed his Dynasty Sports' Trade Secrets to his personal Gmail address. And he continued to access the Trade Secrets following the end of his employment. Thus, Dynasty Sports is likely to succeed in showing that Defendants have actual possession of the trade secrets misappropriated by Defendants from Dynasty Sports.

### f. Dynasty Sports Describes with Reasonable Particularity the Matters to be Seized and Their Location

The matters to be seized include all data and digital files on Escoriaza's computers and computer devices, including tablets, smartphones, external storage devices, and networks of Escoriaza, including files housed on any servers, laptops, desktop computers, and "cloud" or other online storage folders, to preserve all of the Trade Secrets and evidence of their misappropriation, as described in the accompanying Proposed *Ex Parte* Seizure Order and Evidence Preservation Order. The description is simple, clear, and reasonably particular. The seizure is limited to copying or imaging of digital files and data in a manner that minimizes disruption to any legitimate business operations of Escoriaza. A more particular description of filenames to be seized would require more time, expertise, and disruption to identify, locate, and copy them. Copying and preserving files so they may be placed in the custody of the Court and later be searched by an independent technical expert minimizes the burden on Escoriaza. The location of the seizure is Escoriaza's residence at 2525 NW 84th Ave. Apt. 208, Doral, FL 33122, at a time when Escoriaza is expected to be home. *See* Report on Investigation, attached as **Exhibit "E."** Thus, the matters to be seized and location are described with reasonable particularity. The description provided in the accompanying Proposed *Ex Parte* Seizure Order and Evidence Preservation Order is substantially similar to the description approved by the District Court of Utah in both *Solar Connect, LLC v. Endicott*, 2018 WL 2386066 (D. Utah April 6, 2018) and *Axis Steel Detailing, Inc. v. Prilex Detailing LLC*, 2017 WL 8947964 (D. Utah June 29, 2017).

### g. If Dynasty Sports Were to Proceed on Notice, Escoriaza Would Destroy, Move, Hide or Otherwise Make Such Matter Inaccessible to the Court.

Given the nature of electronically stored information, combined with Escoriaza's IT knowledge and malicious prior conduct, providing Escoriaza with advance notice creates a serious risk that he would destroy evidence. *See All Leisure Holidays Ltd. v. Novello*, 12-62328-CIV, 2012 WL 5932364, at *6 (S.D. Fla. Nov. 27, 2012) ("Given the malleable nature of electronically stored information, the Court finds sufficient cause to support entry of an *ex parte* TRO."). If Dynasty Sports were to proceed on notice, Escoriaza could easily destroy, move, hide or otherwise make unavailable the Trade Secrets and related evidence at a moment's notice. As previously discussed, Escoriaza possesses the technical sophistication to quickly destroy and cover up evidence of his misappropriation. Because the Trade Secrets and evidence of their misappropriation are contained in digital and electronic files and accounts, they can quickly be erased, moved, and obfuscated. Escoriaza took calculated measures to avoid detection of his misappropriation, as discussed above. Thus, there is a high risk that, given any notice, Escoriaza will destroy, move, hide, or otherwise make such matters inaccessible to the Court and thus avoid preservation and production of the Trade Secrets and evidence of his misappropriation.

### h. Dynasty Sports has Not Published the Requested Seizure at Any Time.

Dynasty Sports has not publicized the requested seizure or otherwise published or made public, at any time, any statement regarding the requested seizure. Halberg Aff, ¶ 30.

For the above stated reasons, Dynasty Sports has satisfied all requirements for an *ex parte* seizure under the DTSA, and the Court should order an *ex parte* seizure.

### ii. A $5,000 bond should be required.

The DTSA requires that a person obtaining a seizure order provide security in an amount determined adequate by the court for the payment of damages that any person may be entitled to recover as a result of a wrongful or excessive seizure or wrongful or excessive attempted seizure. 18 U.S.C. § 1836(b)(2)(B)(vi). In the *Solar Connect* and *Axis Steel* cases discussed above, where the seizures paralleled the one requested in this Motion, the District Court of Utah determined that a $5,000 bond was appropriate. In *Solar Connect*, the court specifically stated in its order that "[a]dditional security will not be required as [d]efendants will keep possession of all their

computers and files, and this [o]rder is only requiring that copies be made." *See Solar Connect,* 2018 WL 2386066 at *5.

Similarly, here, because the seizure is limited and only requires removing Escoriaza's computer devices from his possession for the short time it takes to make copies, the potential damage to Escoriaza if that seizure is determined wrongful or excessive is minimal. Accordingly, the required security should be limited to $5,000.

### B. Dynasty Sports is Entitled to an Order to Preserve Evidence under the Court's Inherent Authority and the All Writs Act.

Dynasty Sports seeks an order compelling Google to preserve information related to Escoriaza's personal Gmail account, to which he sent Trade Secrets and Confidential Information, as discussed above. While Dynasty Sports does not believe that Google would destroy or hide evidence, Google has no legal obligation to preserve evidence and, as explained above, Escoriaza has the means, expertise, motive, and has demonstrated the willingness to destroy this evidence that only Google can otherwise preserve. A specific order from the Court is not normally required to direct a party to preserve evidence, because the Federal Rules of Civil Procedure contemplate the parties will preserve evidence they know or should reasonably know is relevant to litigation. *See* Fed. R. Civ. P. 11, 26, 34; *Danis v. USN Communications, Inc.*, 53 Fed. R. Serv. 3d 828, at *1 (N.D. Ill. 2000); *United States ex rel. Smith v. Boeing Co.*, No. Civ. A. 05-1073-WEB, 2005 U.S. Dist. LEXJS 36890, 2005 WL 2105972, at *2 (D. Kan. Aug. 31, 2005). But courts have the inherent authority to issue evidence preservation orders when necessary. *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135 (Fed. Cl. 2004).

Likewise, under the All Writs Act, 28 U.S.C. § 1651, "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." Thus, under authority of the All Writs Act, "at the court's discretion, writs may be issued to third parties who are in a position to frustrate a court's administration of its jurisdiction." *Abdo v. Reyes*, 91 F. Supp. 3d 1225, 1233-34 (D. Utah 2015) (*citing Burr & Forman v. Blair*, 470 F.3d 1019, J 026-27 (11th Cir. 2006) (*citing United States v. New York Tel. Co.*, 434 U.S. 159, 174, 98 S. Ct. 364, 54 L. Ed. 2d 376 (1977))).

Here, there is a serious risk that Escoriaza will quickly destroy, hide, or otherwise make evidence undiscoverable within minutes of receiving notice of this case. Loss of files and data

containing the Trade Secrets and evidence of misappropriation will irreparably harm Dynasty Sports and prevent Dynasty Sports from mitigating or preventing other irreparable harm described above. Thus, an evidence preservation order is appropriate and necessary to prevent Escoriaza from destroying evidence in his Gmail account, particularly since Google has no other legal obligation to (or knowledge of the need to) preserve evidence. Moreover, Google is the only entity in a position to preserve evidence in the Gmail account, other than Escoriaza, who is likely to destroy or hide the evidence. Thus, it is reasonable and necessary for the Court to enter a preservation order directing third party Google to preserve Escoriaza's data and files and deliver them to the custody of the Court as set forth in the accompanying Proposed Order.

### V.     CONCLUSION

Dynasty Sports is seeking very limited relief. The requested seizure barely burdens Escoriaza, while protecting Dynasty Sports from Escoriaza's likely destruction of evidence. This situation parallels almost exactly the circumstances in *Solar Connect*, where the court permitted an identical seizure. A near-unanimous Congress provided for this remedy to protect victims of trade secret theft, like Dynasty Sports, in these circumstances. The Court should give life to this statutory provision by granting the requested relief.

In accordance with Local Rule 7.1(a)(2), this Motion is accompanied by a proposed order granting Dynasty Sports the relief requested herein is attached as **Exhibit "F."**

WHEREFORE, Dynasty Sports respectfully requests this Honorable Court: (1) grant this Motion; (2) enter an *ex parte* seizure order; (3) enter an *ex parte* evidence preservation order; and (4) grant any further relief this Court deems just and appropriate.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**CERTIFICATION OF COUNSEL AS TO EMERGENCY NATURE OF MOTION**

After reviewing the facts and researching applicable legal principles, I certify that this Motion in fact presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Could would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days. I understand that an unwarranted certification may lead to sanctions.

Dated: June 3, 2019.

Respectfully submitted,

/s/Eric Ostroff
Eric Ostroff
Fla. Bar No. 10130
eostroff@melandrussin.com
Meaghan E. Murphy
Florida Bar No. 102770
mmurphy@melandrussin.com
MELAND, RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221

*Attorneys for Dynasty Sports*